UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>**FBI EVIDENCE ITEM 74 - ASUS**<br>**LAPTOP S/N H5N02U020458188**<br><br>CURRENTLY LOCATED in the FBI<br>Charlottesville Resident Agency Evidence<br>Locker at 2211 Hydraulic Road, Suite 201,<br>Charlottesville, Virginia 22901 | Case No. 5:20-mj-00007 |

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION UNDER RULE 41 FOR A**
**WARRANT TO SEARCH AND SEIZE**

I, Stephen Duenas, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a search warrant authorizing the examination of property—an electronic

device—which is currently in law enforcement possession, and the extraction from that property

of electronically stored information described in Attachment B.

2.      I am an "investigative or law enforcement officer" of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct

investigations of, and to make arrests for, offenses in violation of Title 18 and Title 21, United

States Code. Specifically, I am a Special Agent with the Federal Bureau of Investigation (FBI) and

have been so employed since January 2000.

3.      I have participated in numerous criminal investigations focused on firearms, armed

drug trafficking violations, criminal street gangs and kidnappings. I have investigated violations of

Title 18, United States Code, Section 1201 (Kidnapping), Title 18, United States Code, Section 1512

(Tampering with Witnesses), and Title 18 United States Code 924 (Weapons Offenses).  I have experience in the investigation, apprehension and prosecution of individuals involved in firearms offenses, violent criminal offenses and kidnapping. I have also been trained on the use of cellular and electronic devices to include performing forensic examinations on such devices.

4.      The facts in this affidavit come from my personal observations, my training and experience, social media accounts, as well as information obtained from other law enforcement officers and in interviews with witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that multiple violations of Title 18, United States Code, Section 1201 (Kidnapping), Title 18, United States Code, Section 1512(k) (Conspiracy to Kill Witnesses), and Title 18, United States Code, Section 924(c) (brandishing firearm during commission of a crime of violence), by the individuals listed herein. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband, or fruits of these crimes, as described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.      The property to be searched is **FBI Evidence Item 74 - ASUS Laptop S/N H5N02U020458188,** hereinafter described as the Device, which is currently located in the FBI Charlottesville Resident Agency evidence locker at 2211 Hydraulic Road Suite 201 Charlottesville, VA, within the Western District of Virginia.  The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

2

## PROBABLE CAUSE

7.        On July 29, 2018, shortly before 11:30 PM, Parents A and B, who are husband and wife, were in their residence with their two daughters at ▮▮▮▮▮▮▮▮▮▮, Dayton, Virginia, which is located within the Western District of Virginia.  The two daughters were ages ▮▮ years old and ▮▮ months old, respectively, and were asleep in their rooms.  Parents A and B are of the ▮▮▮▮▮ faith and live in a ▮▮▮▮▮ community.  At that time Parent A and Parent B observed a vehicle pull up to their home. Three subjects, two males and a female approached the home and were greeted by Parent A.   When Parent A observed that one of the subjects possessed a handgun, Parent A attempted to shut the door and prevent the subjects from entering his home.  The subjects, however, forced their way into the home.

8.        Parent B observed this activity and grabbed the cordless phone, ran from the home, and called 911 to report the home invasion.   A deputy with the Rockingham County Sheriff's Office (RCSO) was nearby and responded to the call.   Upon arrival, the RCSO deputy made contact with Parent B and obtained a brief explanation of what had taken place. Two of the subjects were also out in the yard of the property when the RCSO deputy made contact with Parent B. According to Parent B, she was too frightened to tell the RCSO deputy that these people were involved in the offense fearing that they might shoot him.

9.        Without knowing their involvement and believing them to be mere bystanders or neighbors, the RCSO deputy requested that the two subjects transport Parent B to the nearby Krossroads Kountry Store where she would be safe. The two subjects complied, and after dropping Parent B off, fled the scene.  The FBI has obtained footage from the RCSO deputy's dashboard camera, which contained portions depicting the two subjects.  Upon review of that footage, the

3

two subjects appear to be consistent with Valerie Hayes and Gary Reburn in build, physical characteristics, and likeness.

10.     After speaking with Parent B, the mother of the two potential abductees, law enforcement subsequently obtained and reviewed security video from the Krossroads Kountry Store on the night of July 29, 2018, where she had been dropped off by two of the subjects.  The video depicts a silver Mercedes Benz SUV.

11.     The RCSO deputy then entered the home and safely retrieved the two daughters. The RCSO deputy continued to search the home and found Parent A lying on the basement floor with his wrists bound behind his back with zip ties.  The RCSO deputy observed a male with a handgun hiding under the stairs in the basement, pointing the gun at Parent A.  The RCSO deputy took this subject, later identified as Frank Amnott, into custody.  Other law enforcement responded to the scene and began a comprehensive investigation.  Parents A and B confirmed that three subjects were involved in the home invasion and that both of the males were armed with handguns. Parent A was interviewed and advised that after the suspects entered the home, he was escorted by both armed male suspects, to the basement.  Once in the basement, the subjects ordered him to the ground and bound his hands, with zip ties, behind his back.  The second male suspect then went upstairs.  Parent A could hear movement upstairs and believed he could hear his oldest child making a sound.

12.     Soon after Frank Amnott was incarcerated in the Rockingham County Jail, law enforcement reviewed the calls he had made from jail.  Frank Amnott had contacted the phone number 202-329-2792. An investigator with RCSO called that number and spoke with Jennifer Amnott, who is Frank's wife (Jennifer).  She was evasive and told the RCSO investigator that she was in a location at which law enforcement could not get to her.  According to the RCSO

investigator, Jennifer did not appear to be surprised that Frank had been arrested and she did not seem to be surprised about the charges against Frank.[1]

13.     Interviews with family members of the Frank and Jennifer Amnott revealed that the Amnotts were living in Florida had been trying to conceive and adopt children but everything they had attempted has failed.  These family members have informed law enforcement that the Amnotts were introduced to Valerie Hayes because Hayes could facilitate their locating and adopting a baby.

14.     In its investigation, the FBI has obtained and reviewed a copy of Jennifer Amnott's diary (the diary).  The diary reveals, among other things, that Jennifer and Frank Amnott were introduced to Valerie Hayes through a mutual friend.  Valerie Hayes promise the Amnotts that she could get them children.  According to the diary, the Amnotts paid Valerie Hayes substantial sums of money for adoptions of young children, none of which was successful.   It also appears, according to the diary, that Valerie Hayes at some point represented herself to the Amnotts as working for British Intelligence Services and, as part of this employment, she claimed that she

---

[1] Frank Amnott was charged with Burglary at night to commit felony armed conspiracy a violation of the Code of Virginia 18.2-22/18.2-89, (two counts), Use of a firearm in the commission of a felony a violation of the Code of Virginia 18.2-53.1(six counts), Abduction by force, a violation of the Code of Virginia 18.2-22/18.2-47(two counts), Attempted Robbery, a violation of the Code of Virginia 18.2-26/ 18.2-58, Conspiracy to commit Robbery, a violation of the code of Virginia 18.2-22/18.2-58, Brandishing a Firearm, a violation of the Code of Virginia 18.2-482.  He was subsequently charged in the United States District Court for the Western District of Virginia on three counts:   (1) Conspiracy to Kill Witnesses, in violation of 18 U.S.C. §  1512(k); (2) Conspiracy to Kidnap, in violation of 18 U.S.C. §  1201(c); and (3) Brandishing a  Firearm During the Commission of a Crime of Violence, in violation of 18 U.S.C. §  924(c).  On December 11, 2019, he pleaded guilty.

could somehow obtain access and provide children who had "nowhere to go" or who otherwise were victims of abuse or neglect.

15.     Search warrants were served to cellular phone carriers to identify the subjects involved in the home invasion.  The cellular phone carriers were able to provide text message content from **202-370-7789**, a cellular phone subscribed to Frank Amnott, and from **202-329-2792**, a cellular phone subscribed to Jennifer Amnott.

16.     The search warrants revealed several different phone numbers exchanging text messages over the course of several days preceding and including July 29, 2018, the day of the attempted kidnapping.  The phone numbers communicating with the group and their area codes, and service providers are as follows:

| 1-678-915-8829 | Bandwidth.com | Area Code-Atlanta, GA |
| 1-202-231-9498 | Verizon | Area Code-Washington D.C. |
| 1-443-750-1000 | Verizon | Area Code-Maryland |
| 1-301-651-9613 | Verizon | Area Code-Maryland |
| 1-240-750-5109 | Verizon | Area Code-Maryland |
| 1-202-329-2792 | Bandwidth.com | Area Code-Maryland |
| 1-202-329-2792 | Verizon | Area Code-Maryland |

17.     Through various sources, the FBI has associated each of the following numbers with the following individuals.

18.     The phone number **240-750-5109** has been associated with Valerie Hayes through numerous connections, to include that she has identified this as her phone number in sworn deposition, the number is listed in her ex-husband's phone as "Val," and public databases and open sources also link this number to her.

19.     The phone number **301-651-9613** has been associated to Gary Blake Reburn through various sources, including but not limited to the fact that the number is subscribed to by

Gary Blake Reburn according to public databases; a Google search of his name includes his biography, his photograph, and lists the number below; in the text messages obtained by the search warrants, a text message from this number identifies as "Blake here."  Blake is Gary Reburn's middle name.

20.     The phone number **202-329-2792** has been associated to Jennifer Amnott through various sources, including but not limited to the fact Frank Amnott called this number on July 30, 2018 after his arrest;  and that the RCSO investigator called the number the recipient identified herself as Jennifer Amnott, and the number is listed as associated with Jennifer Amnott according to public databases.  Finally, this number is listed under the name "Jen Amnott" as the emergency contact for Valerie Hayes on her passport.

21.     A review of the text messages revealed a plot in which Valerie Hayes, Gary Reburn (Hayes' boyfriend), and Frank Amnott, Jennifer Amnott, and potentially others, agreed to participate in a plot to travel from Maryland to Virginia to surveil families with small children, to invade a home, and abduct the children, and that Hayes, Reburn, and Frank Amnott were the three subjects that conducted the home invasion and attempted child abduction that was thwarted by the RCSO on July 29, 2018 in Rockingham County, Virginia.

22.     The text messages were being sent to and received by numerous phone numbers. Upon review of over 1000 text messages that included Jennifer Amnott (Jennifer), Frank Amnott (Frank), Hayes, and Reburn, as well as conversations between individual members of the group revealed the following:

   a.   Members of the group, to include Hayes, Frank, Reburn, and possibly others, conducted surveillance of families in the area, including a family other than that of Parent A and B, which had male children.

7

b.  Members of the group considered getting clothes for the children in advance of the planned kidnapping. On July 22, 2018, Hayes sent a text message to Jennifer, "you may want to get some clothes for the little boy." To which Jennifer replied that she was worried that "we won't be getting our babies. . . maybe we can go shopping with the boy on Tuesday, and let him pick out something he likes too?"

c.  Members of the group named the children that they sought to abduct in advance. On July 22, 2018, Hayes sent a text message to Jennifer saying, "I can't remember if I told you if you're going to need to name him. To which Jennifer replied, "[Y]es, Frank chose Caleb Jesse. I am picking a second middle later. Thinking on it." According to the text messages, another child was named "Ronan." Later, on July 25, 2018, Jennifer texted Frank, "Ask V if she thinks these would fit Caleb? They're on clearance…."

d.  The group had been planning the abduction for days, and they wanted to attempt the abduction on July 28, 2018 or the early morning of July 29, 2018. On July 28, 2018, Jennifer texted Frank, "So what are y'all going to do, when are you planning to attempt? Are you going to be there all day tomorrow? Have y'all had eyes on the kids." Frank responded, "Been a long night. Can't wait for it to be over." Later that same day, on July 28, 2018, Hayes texted to Jennifer, "I am going to have to pull Blake into this as I need an extra set of hands and eyes . . ." and then that "Blake is willing and ready and I'm thinking we could leave at five if Frank is willing to go. . . . We would be back by midnight as we will go in take thirty minutes or so and go out." Throughout July 28, 2018, the group continued to plan the kidnapping in the following texts: Jennifer texted Frank, ".… She needs you. But it would be

8

her, Blake, and you." Hayes texted Jennifer, "If we go tonight . . . Three of us . . .
We can get them. . . . Not one doubt in my mind or heart or faith." A few hours
later, Jennifer texted Frank, "Y'all getting close?" to which Frank replied "Closer."
Jennifer later told Frank, "I'm just terrified this is gonna be another there all night
and come home empty handed." Frank told her, "Have a solid plan for the morning
and we will see you with everyone in the morning."

e.   The morning of July 29, 2018, the group decided to delay the abduction attempt
again. Frank texted Jennifer, "Changing up again" to which Jennifer replied,
"What?! What now. Please please don't' tell me it's delayed another day again.
We can't keep doing this." Frank then replied, "Still today." Jennifer responded,
"Just make sure you come home. And please bring our son." Hayes texted Jennifer,
"we need to go after dark but when they are awake.".

f.   On the morning of July 29, 2018, it appears from the text message that an additional
co-conspirator with an alias "Bjorn Rassmussen" (Bjorn) joined the group
messages and took the lead on surveillance. Bjorn was being assisted by another
individual named "Wheeler" who apparently was using drones to conduct
surveillance. Reburn texted the group "B[jorn] what's going on. Any intel from
wheeler and drone activity" and later that same night "We need Intel from you and
wheeler. We are going in tonight . . . at dusk or just before. The same game plan
as last night."[2]

---

[2]       To date, law enforcement is still investigating the identities and the extent of the
involvement of "Bjorn" and "Wheeler."

g.   That same morning, the group sought to locate the church attended by the Parent A and B and broke into their residence while the family was at church to observe, among other things, the size of the children's clothing and the layout of the house. Reburn texted the group, "Are we clear to go in the house?"  Later, Reburn texted the group, "I just searched the house Ronan size shoes and clothes 3 rifels in the back sec[t]ion. . . 3 floor gutted Basement gutted 2nd floor storage 1sr floor kitchen bedrooms living area laundry."  Hayes texted Jennifer, who was in Maryland, "Gary and I went into the house as all are at church. . . . Ronans panties and dresses were there."

h.   As night approached, the group requested any "intel" that Bjorn could provide from surveillance.  Hayes texted the group, "Okay ready for intel ASAP please, sun is setting now.  Everything you have then we will work with it."  Bjorn replied to the group: "Okay so only one couple at the big house. . . no one supposed to come by but still do quick. . . . Ronan and Juniper [whom law enforcement infers are the children of Parent A and B] are at the big house.  Second house only three boys one of them caleb he maybe seven not eight.  Calm and careful getting in there because have phone maybe call police.  So very careful.  Lady will be very compliant." Reburn asked: "One phone or two."  Bjorn replied:  "Think only one.  Need both in sight right away.  Want lights down curtain drawn as soon as possible nosey neighbor.  Use front door so dog no bark like crazy.  Maybe small rifle in back porch second house. . . ."

i.   As part of the plan, the group discussed the possibility of drugging the children to facilitate the abduction. Bjorn sent to the group, "Probably some things in small sewing room to blindfold and keep boys quiet after give sleepy medicine tablets."

j.   Just before the home invasion around 11:30 pm on July 29, 2018, Jennifer checked in with Frank about the group's status, sending a text that said, "Y'all heard anything yet?" Frank replied to Jennifer, "Have the info, getting ready to go. . . . around dark." Later, Frank texted to Jennifer, "Love you. Shutting off."

k.   Jennifer subsequently sent several frantic texts to Frank, none of which were returned because Frank Amnott had been arrested. Jennifer sent a text message to Bjorn [date/time], stating "Bjorn, please if you see this find a way to delete his fingerprints if you can . . . " On July 31, 2018, Jennifer also sent a text message to Hayes stating, "I literally don't know what to do. . . . All I can think is I'm never seeing him again." After a delay, Jennifer texted Valerie, "Boarded," to which Valerie replied, "see you soon in Glasgow."

23.   In reviewing the text messages, agents noted that the conspirators used language potentially indicating that the potential abductees were somehow related to Valerie Hayes or the Amnotts. For example, they may refer to the children as "my" or "our" babies. Law enforcement has confirmed that the children of Parent A and B are indeed their biological children.

24.   A check of the Maryland Department of Motor Vehicles determined that, Gary Blake Reburn, residing at 4408 Brookfield Drive, Kensington, MD 20895, is the registered title holder of a silver 2011 Series 450 Mercedes Benz SUV, with Maryland License Plate 4DJ-7716. Reburn, as noted above, is the same individual associated with one of the phone numbers (301)

11

651-9613 and is the boyfriend of Valerie Hayes, who is associated with one of the other phone numbers.

25.    In addition to the text messages, law enforcement obtained additional evidence corroborating that the conspirators conducted surveillance of families in the area with intent to abduct children.  Several individuals reported seeing a silver Mercedes Benz SUV around Dayton, Virginia with Maryland license plates on during the days prior to July 29, 2018.  More specifically, in the days prior to the attempted abductions, there were seven separate complainants that recalled seeing the Mercedes or a silver SUV with Maryland license plates.  Two complainants reported that they had seen the Mercedes at Parent A and B's residence on July 29, 2018, the day of the home invasion and attempted abduction.  One complainant reported the vehicle was parked in the yard between 10:30 and 11:00 AM.  The other complainant reported seeing the Mercedes in that driveway at about 11:15 AM and a man and woman were observed standing on the porch.[3]

26.    In the days prior to the attempted abductions, another complainant reported seeing two men and a woman in this car and one of the men described appeared to be Frank Amnott.  Another complainant reported seeing a male and female occupant in the vehicle doing something on cell phones.  The vehicle was observed at local businesses and residences in areas that appeared suspicious to the people that live in this area.  In many cases limited or no description of the vehicle occupants was provided.

---

[3]  Notably, the text messages – as outlined above – reveal that the conspirators sought to break into Parent A and B's residence while they were at church as a step in their plot.  The observation by these complainants corroborate those text messages, as the date and time of these observations of the conspirators' vehicle are consistent with when Parents A and B would be expected to be at church, that is, 10:30 to 11:15 am on a Sunday morning.

27.     Further investigation revealed that, months prior, on March 5, 2018, the RCSO received another report of a suspicious vehicle in the area.  The reporting individual stated that a suspicious black Ford F150 pickup was observed at her father's residence.  The RCSO made contact with the female driver, who was identified as Valerie Burns Hayes from a Maryland Operator's License and she was cited for driving on a suspended license. Valerie Burns Hayes has an alias of Valerie Perfect Hayes.

28.     Law enforcement currently knows no connection or legitimate reason as to why Frank Amnott, Gary Reburn, or Valerie Hayes would be present in a small ███████ community in Dayton, Virginia located in Rockingham County, Virginia.   At the time of the attempted abduction, Frank Amnott resided in Florida, and Gary Reburn and Valerie Hayes resided together in Kensington, Maryland.  Pursuant to court-authorized legal process, law enforcement obtained cell-site location data for the phone numbers associated with Reburn, Hayes, and Frank Amnott. Preliminary analysis confirms that those phones were located in and around the Harrisonburg/Rockingham County region of Virginia.

29.     As part of its investigation, the FBI sought to review the publicly viewable Facebook account of Valerie Hayes, which contains statements and photos that she is currently residing in England with Gary Reburn.  According to the United States Customs and Border Protection Agency, Hayes traveled to England from the United States on August 7, 2018 with Gary Reburn, Jonathan Dawson, (her ex-husband), and her minor children.  On August 1, 2018, Jennifer Amnott traveled from the United States to Ireland.  She provided conflicting statements to Ireland immigration officials that resulted in her being denied entry into Ireland.  According to the most recent information obtained by the FBI, she returned to the United States and then flew to Iceland. Hayes, Reburn, and Jennifer Amnott are all United States citizens, and this travel is suspected to

be an attempt to flee law enforcement authorities after Frank Amnott's arrest during the attempted abductions of July 29, 2018.

30.     Valerie Bums Hayes has an alias of Valerie Perfect Hayes. The investigation to date has revealed that Witness-1 (W-l) is the ex-husband of Hayes, and the biological father of two children with Hayes. On November 16, 2018, agents of the Federal Bureau of Investigation interviewed W-l and learned that W-l was with Reburn and Hayes in the days leading up to, and including, their flight from the United States. W-l told agents of the FBI that, before leaving the country, Reburn put his Silver Mercedes Benz SUV in storage at a self-storage facility off of Cherry Lane in Laurel, Maryland. Subsequent investigation confirmed that in fact there is a private storage facility in that location, more specifically, Cube Smart Self Storage, located at, 8704 Cherry Lane Laurel, Maryland.

31.     Agents of the FBI made contact with a representative of Cube Smart Self-Storage, and that representative confirmed that Reburn was a customer of Cube Smart Self-Storage and that he contracted with them for one (1) parking space, in which there was parked a silver Mercedes Benz SUV.

32.     On November 28, 2018, Reburn, Perfect, and Jennifer Amnott were arrested in Glasgow, Scotland and are pending extradition. On November 30, 2018, a representative of Cube Smart Self-Storage informed the FBI that someone was present at their location and was seeking to take the aforementioned silver Mercedes Benz SUV.  The representative contacted the local law enforcement authorities, that is, the Prince George's County Police Department, who arrived on the scene. Soon thereafter, agents from the FBI Baltimore Field Office responded to the Cube Smart located, at 8704 Cherry Lane, Laurel, MD.

33.     Upon arrival, the silver Mercedes Benz SUV was attached to a tow truck inside the Cube Smart fenced property. Through discussions with Cpl. Robert Frost of the Prince George's Police Department, the vehicle was initially located in the facility and the tow company was contacted. The vehicle was then towed to the FBI Baltimore Field Office located at 2600 Lord Baltimore Drive, Windsor Mill, MD. FBI agents escorted the vehicle to this location where the vehicle remains to date in a secure location.

33.     On December 7, 2018, a search warrant was issued by the United States District Court, District of Maryland authorizing the search of a silver 2011 Series 450 Mercedes Benz SUV, Maryland License Plate 4DJ-7716, vehicle identification number 4JGBF7BE6BA713857. Further, identified as the vehicle as outlined above.  During the execution of this search, FBI evidence item 74, a ASUS Laptop S/N H5N02U020458188(the Device) was seized and is currently in the lawful possession of the FBI.  Therefore, while the FBI might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

34.     The Device is currently in storage at the FBI Charlottesville Resident Agency, 2211 Hydraulic Road, Suite 201, Charlottesville, Va. in an evidence locker. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.

## **TECHNICAL TERMS**

36.     Based on my training and experience, I use the following technical terms to convey the following meanings:

15

    a.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    b.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

37.    Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.asus.com/event/2018/productguide/my/PG_PC_Feb_Mar.pdf, I know similar ASUS devices have capabilities that allow it to serve as a, digital camera, portable media player, GPS navigation device, and PDA**.**  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

38.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

39.     There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few

17

examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.   Computer users typically do not erase or delete this evidence, because special software is typically required for that task.   However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

40.   *Forensic evidence.*   As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.   There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

41.   *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

42.   *Manner of execution.*   Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the

physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

43.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

## **OATH**

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

*s/Stephen J. Duenas*
Stephen J. Duenas, Special Agent
Federal Bureau of Investigation

Received by reliable electronic means and sworn and attested to by telephone on this ___31st___ day of ___January___ 2020.

JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE

19